IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 25, 2012

**CLEVEN JOHNSON v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Knox County**
**No. 91888      Jon Kerry Blackwood, Judge**

_____

**No. E2011-01621-CCA-R3-PC - Filed June 6, 2012**

_____

The Petitioner, Cleven Johnson, pled guilty to several charges that spanned six different cases: one count of attempting to sell more than .5 grams of cocaine within a drug-free zone; three counts of possession of a weapon in the commission of a felony; one count of evading arrest; two counts of driving on a suspended license; two counts of driving without insurance; one count of driving under the influence, first offense; one count of simple possession of marijuana; one count of possession of a weapon; two counts of aggravated burglary; six counts of attempted especially aggravated kidnapping; one count of aggravated robbery; two counts of aggravated assault; one count of attempted aggravated sexual battery; one count of especially aggravated burglary; and one count of attempted first degree murder. The plea agreement included a total effective sentence of forty years. The Petitioner filed a petition for post-conviction relief, and the post-conviction court dismissed the petition after holding a hearing.[1] On appeal, the Petitioner contends that he received the ineffective assistance of counsel. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's dismissal of his petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined. JERRY L. SMITH, J., not participating.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Cleven Johnson.

---

[1] At the post-conviction hearing, the parties agreed that the Petitioner's conviction for attempted aggravated sexual battery should be reversed and that the Petitioner should receive a new trial because the Petitioner was unaware that the conviction would impose community supervision for life.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**
**A. Guilty Plea Hearing**

This case arises from a series of home invasions by the Petitioner for the purpose of finding and stealing drugs. The Petitioner pled guilty to the follow offenses that originated from six separate cases: one count of attempting to sell more than .5 grams of cocaine within a drug-free zone; three counts of possession of a weapon in the commission of a felony; one count of evading arrest; two counts of driving on a suspended license; two counts of driving without insurance; one count of driving under the influence, first offense; one count of simple possession of marijuana; one count of possession of a weapon; two counts of aggravated burglary; six counts of attempted especially aggravated kidnapping; one count of aggravated robbery; two counts of aggravated assault; one count of attempted aggravated sexual battery; one count of especially aggravated burglary; and one count of attempted first degree murder.

At the plea submission hearing, the State presented the following evidence as the basis for the Petitioner's guilty plea: For one case, which included felony charges for possession with intent to sell more than .5 grams of cocaine within a drug-free zone, possession of a weapon in the course of committing a felony, evading arrest, driving on a suspended license, and driving without insurance, the State informed the trial court that Officer Washam responded to a call about an unidentified vehicle parked in a driveway without the homeowner's permission. The officer arrived at the residence and saw a person, later identified as the Petitioner, exit the vehicle parked in the driveway. Officer Washam decided not to chase the Petitioner because he noticed a shotgun in the vehicle as well as cocaine packaged for sale in the glove compartment. Instead, he issued a Be On the Lookout ("BOLO") call with the Petitioner's description. The home owner stated that the person in the vehicle also went by the nickname "Tabby." Within a short period of time, the officer received confirmation that the fingerprint found in the glove compartment of the vehicle matched that of the Petitioner. Officer Washam later sought a warrant against the Petitioner but was unable to locate and arrest him that night.

In another case, which included the felony offenses of aggravated burglary, possession of a weapon during a felony, attempted especially aggravated kidnapping, aggravated robbery, aggravated assault, and attempted aggravated sexual battery, the

2

State informed the trial court that the victims, a husband and wife, had left their son with two female babysitters. After the victims left, the Petitioner, armed with a handgun, entered the house in search of drugs. One of the babysitters told the Petitioner that she did not know anything about drugs in the house. The Petitioner forced both of the babysitters and the victims' son into a bathroom, and he struck one of the babysitters in the head and pointed a gun at the victims' son. The victims eventually returned to the house, encountering the Petitioner who demanded drugs. The victims gave the Petitioner a small amount of marijuana from the bedroom and told the Petitioner that they did not have any more drugs. The Petitioner proceeded to touch one of the victims "in the vaginal area while he was armed with a gun," without her permission, and took several items from the home.

In the next case involving felony charges of aggravated burglary and attempted especially aggravated kidnapping, the State informed the trial court that the Petitioner approached a victim with a handgun, forced him inside a third-party's house, and demanded drugs. The victim was unaware whether there were any drugs inside the house, so the Petitioner took items from the house and left.

In the final case with felony charges of especially aggravated burglary, possession of a weapon during a felony, and attempted first degree murder, the State informed the trial court that the Petitioner, James Murry, Tony Dixon, and Haushan Walter Simpson planned to rob Johnny Malone because they believed he had drugs in his home. They planned for Simpson, who drove the truck, to drop off all of the others at Malone's house, they would "do the burglary," and Simpson would pick them back up. They planned the burglary for the afternoon hours because Malone, a barber, would be at work. Per the plan, Simpson dropped off the three men, and they entered the garage, activating the security sensor. The security company contacted Malone and reported movement in his house. Malone immediately left his job to check on his home. At the same time, Officer Rickman, who was on patrol in the area, responded to a 911 call about a possible burglary. Officer Rickman's patrol car was equipped with a video camera, and he had the microphone turned on when he arrived at the house. After the officer arrived and parked, the video camera showed the residential street. Officer Rickman saw two men, later determined to be Murry and Dixon, standing near the street and both wearing white t-shirts. When the officer asked them what was going on, they both fled. The police cruiser video showed Dixon's dreadlocks "bouncing up and down" and Murry's face when he turned around to look in the direction of the police car. The officer continued toward the house, at which point he saw the Petitioner emerge from the house. Officer Rickman started to say "stop," but then the microphone recorded "repeated gunshots" and subsequent moans from the officer. The Petitioner fled, and a neighbor administered first aid to Officer Rickman. The Knoxville Police Department began an investigation and

found two items in the house that contained DNA evidence, one of which was a shirt with Murry's DNA. An officer found and interviewed Simpson, who admitted that he drove the three men to Malone's house. Simpson stated, however, that he did not know their plans. An officer also found and interviewed Dixon, a juvenile at the time. Dixon gave a "full statement" after officers confronted him with his cell phone, which he left at Malone's house, and evidence of Dixon's fingerprint from inside Malone's home. Dixon identified the Petitioner as a participant. Officers also interviewed Ashley Thompson, the Petitioner's girlfriend. She stated that the Petitioner told her that "he panicked, and he shot a police officer."

At the plea submission hearing on all of the Petitioner's cases, the trial court explained to the Petitioner that he would be pleading guilty to "six C felonies, four E felonies, eight B felonies, and one A felony; four A misdemeanors, two B misdemeanors and two C misdemeanors." The trial court continued to explain "that all of these are going to be convictions on [the Petitioner's] record," and that, if convicted of an A, B, or C felony in the future, the Petitioner would be considered a career offender "who would have to serve at least sixty percent of any sentence that [the Petitioner] got in the future." The Petitioner replied that he understood. The trial court explained the plea agreement and the sentence for each conviction to the Petitioner. The Petitioner stated that he understood the agreement. The trial court further explained that the Petitioner would be entitled to a jury trial for each case against the Petitioner. The Petitioner indicated that he understood. The trial court continued to explain the Petitioner's rights and stated that the Petitioner would have the opportunity to testify, "if [the Petitioner] chose to do it." The trial court asked the Petitioner whether he understood that, by pleading guilty, he would give up all of those rights. The Petitioner responded, "Yes sir." Lastly, the trial court asked the Petitioner, "Has [his attorney, Counsel,] explained [] all options to you and explained his discussions with [the State] that led up to this agreement?" The Petitioner responded, "Yes, sir." The trial court then asked the Petitioner if he was satisfied with Counsel's service. To which the Petitioner responded, "Yes, sir. I really am."

The trial court accepted the Petitioner's guilty pleas, finding that the Petitioner entered them knowingly and voluntarily. The trial court sentenced the Petitioner, pursuant to the plea agreement, to an effective sentence of forty years to be served as a Range I standard offender.

### B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. Specifically, the Petitioner alleged that Counsel disregarded the Petitioner's claims of innocence, failing to properly investigate

4

the Petitioner's alibi defense.

At a hearing on his petition, the Petitioner testified about specific instances in which he felt Counsel was ineffective. He first stated that Counsel told the Petitioner that "we would be able to beat" the charge of attempted first-degree murder of Officer Norman Rickman. The Petitioner then explained the version he told Counsel regarding what happened on the day Officer Rickman was shot. He said that he, Ashley Thompson, his girlfriend, and Darius Hunt, his brother, "rode around" and "went to the detention facility 'cause my brother had to get booked." He stated that he was "coming down off of cocaine and Xanax pills, and [] was in and out [of consciousness]." He said that, shortly before 4 p.m., he went to Samantha Smith's salon, stayed there until approximately 6 p.m., and then went to Smith's house. While at Smith's house, Thompson called the Petitioner and told him "that she had got pulled over," and officers took her into custody because "they wanted to question her 'cause she was in a truck that looked like a truck that fit the description of a truck that was used in Officer Norman Rickman['s] case . . . ." The Petitioner called Hunt and told him to "see what's going on," and officers took Hunt to the police station for questioning as well.

The Petitioner testified that, at the preliminary hearing in the Officer Rickman shooting case, Haushan Simpson, the driver of the truck and a witness, "lied several times." The Petitioner recalled that Simpson testified that he, the Petitioner, Murry, and Dixon were at the East Towne Mall earlier that day and that they rode in a black truck that Thompson had rented. The Petitioner agreed that Simpson testified that he dropped off the Petitioner, Murry, and Dixon at a drug dealer's house in order to get money. Simpson testified that, when he drove back to pick up the men, the Petitioner was "running up the street and hopped in the truck," but neither Murry nor Dixon were with the Petitioner. The Petitioner did not, however, recall that Simpson testified that the Petitioner admitted shooting a police officer.

The Petitioner recalled that Thompson, his girlfriend and the mother of his child, testified at the preliminary hearing, recalling that she said that she was taken into custody on the night of the shooting. The Petitioner acknowledged that Thompson testified that the Petitioner told her that he "F'd up" and shot a police officer. The Petitioner stated, however, that Thompson only gave that testimony in order to "save [their] child from going into state custody." The Petitioner did not recall Thompson's testimony about driving the officers to a location where the Petitioner discarded a pair of Nike shoes. The Petitioner did acknowledge that Thompson testified that he and the others were using the truck she had rented that day.

The Petitioner stated that his alibi for the afternoon Officer Rickman was shot was

"airtight." The Petitioner stated, however, that Counsel did not present his alibi to the State, and he did not have any knowledge of Counsel responding to the State's request for notice of alibi in the case. Further, the Petitioner said that Counsel did "nothing" to address the false testimony from either Simpson or Thompson. The Petitioner stated,

> [Counsel] didn't ask for the witnesses to be stricken from the record. He didn't ask for the witnesses to be impeached due to contradictory testimony. He didn't do nothing, but at the time I thought it was all right 'cause I didn't know nothing about what was going on. I just knew I paid a lawyer to do his job, and I thought he was doing it, as far as I knew.

The Petitioner testified that Counsel should have subpoenaed Dixon to testify because Dixon claimed that someone other than the Petitioner shot Officer Rickman.

Regarding the home invasion and kidnapping involving a couple, their son, and two female babysitters, the Petitioner testified that Counsel told him that the case was based on "a suggestive identity process" because the victims in that case "received a phone call" from someone who told them to make sure that the Petitioner "wasn't the guy 'cause the cop got shot . . . two miles right down the street from apparently where the case happened . . . ." The Petitioner stated that, after the victims received that phone call, they identified the Petitioner as the perpetrator. The Petitioner stated that Counsel told him that Counsel "was going to get [the identification] stricken from the record," but they never had an evidentiary hearing on the matter.

The Petitioner agreed that he committed the burglary in a separate case, involving a male victim; however, he denied kidnapping the victim.

Regarding the drug offenses in the case involving the male victim, the Petitioner testified that he "didn't do the drug charges." He stated that the only evidence against him was a fingerprint on a cigarillo box "that had nothing to do with [the Petitioner] being at [the] scene."

The Petitioner testified that he pled guilty to all of the charges because Counsel said that the Petitioner "was looking at 300 years" due to the multiple charges of especially aggravated kidnapping that would be served at one hundred percent and consecutive to one another. The Petitioner stated that Counsel told him that "the best thing for [the Petitioner] to do was to take a deal [of] 40 years at . . . 30 percent . . . ." Petitioner stated that Counsel said that, if he went to trial, he would lose because "the D.A. told the witnesses what to say." The Petitioner testified that Counsel told him that "he wasn't going to take [the Petitioner] to trial." The Petitioner said that he told

6

Thompson to give Counsel "fifteen more thousand dollars" so that he could go to trial. The Petitioner said that Counsel responded, "We're not going to trial. . . . Your best bet is go on and take this deal."

The Petitioner testified that he met with Counsel "a lot" prior to his plea agreement. He agreed that he met with Counsel about ten or twenty times. He stated that Counsel discussed with the Petitioner the potential penalties if convicted at trial. He, however, told Counsel, "Let's go to trial." The Petitioner said that Counsel told him "[h]e was going to take care of it" but later presented the plea offer to the Petitioner.

The Petitioner agreed that he told the sentencing judge that he was pleased with Counsel's services. The Petitioner explained that he only did so because at the time he did not know that Counsel had "violated" his rights or "failed to present [his] alibi." Although the Petitioner told the sentencing judge that he was "really" satisfied with Counsel's services, he testified that he was not happy with the plea agreement because he received forty years. The Petitioner believed that Counsel overstated the penalties in order to persuade him to plead guilty. The Petitioner stated that Counsel was ineffective "due to his incompetence."

Counsel testified that the Petitioner's family contacted him about representing the Petitioner, and he began his representation before the preliminary hearing. He testified that he had practiced law, mainly criminal defense and personal injury cases, for fifteen years. He stated that he had never promised a client any certain result, and he never told a client that he could "get him off" a charge. Counsel remarked that such statements are "a violation of ethical code."

Concerning the shooting of Officer Rickman, Counsel acknowledged that the Petitioner told him about his alibi of being with Thompson and Hunt at the detention facility. Counsel said that he "started looking into that" because it "would be so easy to prove" because "somebody did have to sign in." Counsel stated, "I don't think that person actually signed in," and he wasn't "sure that [Hunt] [was] actually booked on that day." Counsel said he "talk[ed] to at least one person" about the Petitioner's alibi, and that person said that the Petitioner's claims "just didn't happen." Counsel spoke with Thompson, and she said that she did not go to the detention facility on the day of the shooting. Counsel stated that the Petitioner's "talk of an alibi didn't last very long." Counsel also interviewed Hunt about the Petitioner's alibi, but he could not recall Hunt telling him that he was at the detention center on the day of the shooting. Counsel further testified that the Petitioner had him contact another individual who would provide an alibi, but that individual refused to talk with Counsel and "didn't want to have anything to do with" Counsel. Counsel stated that "after everything [Counsel] developed through the

case and in talking with [the Petitioner], [Counsel] would doubt very seriously if [the alibi] was very true." As a result, Counsel informed the Petitioner that "the alibi had fallen apart after the preliminary hearing," and "it was going to be hard to win that case."

Counsel testified that he had difficulty finding an investigator to assist him with the Officer Rickman shooting case. Because most of the investigators were former police officers, it was "very difficult," if not "impossible," to find an investigator willing to assist a person charged with shooting a police officer.

Regarding his interactions with other witnesses, Counsel testified that he thought police officers were pressuring Thompson, so he had counsel retained for her. Counsel did not contact Dixon because separate counsel represented him. Counsel understood from Dixon's attorney that Dixon would testify that the Petitioner acted as the shooter. Counsel knew that Murry had retained counsel and planned to testify that the Petitioner shot Officer Rickman. Counsel stated that he did not speak with Simpson because he was a juvenile at the time. Counsel recalled that he cross-examined him on the stand, and Counsel thought that his testimony was "lacking in detail" and "seemed just kind of nebulous." Counsel stated, "[Simpson] didn't have any idea, according to his testimony, what he was supposed to do or where anybody was going or anything else. They just jump out of the car and [Simpson] drives around and miraculously just pops up at the right place at the right time."

Counsel testified that he did impeach the State's witnesses on the stand during the preliminary hearing, including Simpson's testimony that he "was just driving." Counsel stated that he had "some issues" with Simpson's testimony, which seemed to convey that the Petitioner and the other men "just told [Simpson] where to drive, and he just happened to let [the Petitioner] out at a certain stop sign, and [Simpson] drove around and mysteriously, they just all appeared right there . . . ."

Counsel recalled telling the Petitioner that he would face a potential sentence of two hundred years. He told the Petitioner that he "could probably beat one or two" of the cases, "but if [the Petitioner got] tagged with one of the major[] [offenses], it's over," and Counsel told the Petitioner that he was "going to get tagged with some of" the major offenses. Counsel stated that he reviewed the evidence in each case with the Petitioner. Counsel explained to the Petitioner that he would "have a really, really hard time" fighting some of the charges, and, if convicted, the Petitioner would receive "life."

Counsel had "several meetings" with the Petitioner about the plea offer, with the final meetings lasting "several hours." Counsel said that he "broke it down piece by piece by piece by piece and why," and Counsel stated that he "was really shocked that [the

Petitioner] could actually get a deal like that, . . . a 40-year sentence at 30 percent for all of these cases . . . ."

James Murry, one of the men involved in the Officer Rickman shooting, testified that, on that day, he was with "Shaun, Tony, and Black." He identified "Shaun" as Simpson, "Black" as a man from Atlanta, and "Tony" as Dixon. He stated that the four of them rode in Thompson's rented truck "to see what . . . dope boy houses" they were "going to hit." He testified that they drove by Johnny Malone's house and stopped at a pawn shop to purchase a crowbar. After they bought the crowbar, they went to Malone's house. He testified that he, "Tony," and "Black" got out of the car, and "Shaun" stayed in the driver's seat of the truck. "Tony" hit the window, the alarm went off, and he told everyone to leave. Murry testified that he, "Black," and "Tony" returned to the truck, and they drove to the barber shop where Malone worked to see if he left the shop "to answer the alarm." Then they arrived at the barber shop, they saw that Malone's car was still there, so they decided to return to the house. Murry testified that "Tony opened the window back up," and "Black" went inside. Murry said that he saw the police officer and yelled, "Hey, Black, police." Murry said that he and "Tony" ran away, and, as they ran, they heard gun shots. Murry testified that the Petitioner "wasn't with us the whole day."

Murry testified that he watched the video from Officer Rickman's police cruiser and admitted that he was the person running in the front, and Dixon was the person running behind him.

Murry also admitted that, in several recorded phone calls from jail, he first denied any involvement in the home invasion and then admitted that he had been involved. Murry testified that he prepared an affidavit on July 13, 2010, outlining the events of the day of the shooting. Murry wrote that the Petitioner "had no part[] of it" because he wasn't with them that day. Murry testified that he told his attorney that the Petitioner did not participate in the home invasion because "he wasn't even with [them] that day." Murry stated that his attorney told him not to "worry about [the Petitioner]" because "all the evidence points towards [the Petitioner]."

Darius Hunt, the Petitioner's brother, testified that, on May 20, 2008, the day of the shooting, he had to "get booked" at the detention facility at 2 p.m., and his sister, Ashley Thompson; his nephew, Noah, a baby at the time; and the Petitioner went with him. He testified that they arrived at the detention facility "sometime between 1:30 and two" and remained there until approximately 4 p.m. Hunt stated that neither he nor the Petitioner were anywhere near Malone's house that afternoon. Hunt clarified that, while he was "getting booked" at the detention facility, Thompson and the Petitioner waited for him "in the van."

Hunt admitted that, the night of the shooting, police took him "into the safety building" for questioning, and he did not tell them that the Petitioner was with him that afternoon. Hunt said that he did not explain the details to the police because the "only thing they asked [] was if [Hunt] had any brothers."

Hunt testified that he spoke with Counsel about the Petitioner's alibi because Counsel informed Hunt that he would use it at the preliminary hearing. Hunt stated that Counsel told him that Counsel would make sure Hunt was there "if he needed [Hunt]." Hunt, however, did not attend the preliminary hearing and agreed that he was available to testify for the Petitioner because he was out of custody at the time of the preliminary hearing.

Hunt acknowledged that the post-conviction hearing was the first time he came forward with his testimony regarding the Petitioner. He admitted that he and the Petitioner communicated through letters, but he denied that they discussed his post-conviction testimony.

## II. Analysis

On appeal, the Petitioner maintains that he received the ineffective assistance of counsel because Counsel disregarded the Petitioner's claims of innocence and failed to properly investigate the Petitioner's alibi defense.

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The Petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can only be overcome when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this court, with no presumption of correctness. *Id.* at 457.

Both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution guarantee the right of a criminally accused to representation. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that trial counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or the services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). We should not deem that

counsel was ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

The post-conviction court found that Counsel's testimony was credible. The post-conviction court accredited both Counsel's testimony that he investigated the Petitioner's alibi defense and Counsel's determination "that the alibi defense was no longer viable." The post-conviction court acknowledged that Counsel informed the Petitioner that the alibi defense would not be viable at trial, and there was "no evidence in this case that the [P]etitioner contested that decision prior to his guilty plea." Ultimately, the post-conviction court found that Counsel "made a proper investigation" and "presented [the Petitioner] with alternatives in this case."

The post-conviction court found that the testimony of Murry and Hunt were "not credible," stating that "[t]hey're, in fact, more incredible than credible." The post-conviction court could not see how, "under any circumstances, . . . Murry's testimony[] would ever be supported by a jury." The post-conviction court further found that the Petitioner had not proven by clear and convincing evidence that Counsel "was ineffective in establishing or pursuing an alibi defense in this case." We agree with the post-conviction court.

The Petitioner informed Counsel of his alibi defense, upon which, Counsel

12

immediately began to investigate because he knew it would be "easy" to prove or disprove whether a person had been booked at a detention facility because that person would be required to sign in at the facility. Counsel stated that he did not believe Hunt had actually signed in at the detention facility on the day of the Officer Rickman shooting. Counsel recalled that he spoke "to at least one person" about the Petitioner's alibi and that person said that the Petitioner's claims "just didn't happen." Further, Counsel spoke with Thompson about the Petitioner's alibi, and she denied going to the detention facility that day. Counsel testified that the Petitioner's "talk of an alibi didn't last very long," specifically stating that "the alibi had fallen apart after the preliminary hearing." After conducting his investigation, Counsel told the Petitioner that "it was going to be hard to win that case" using the alibi defense. As a result, we find that Counsel properly investigated the alibi defense. The Petitioner has not proven that Counsel's representation fell below a reasonable standard, and he is not entitled to post-conviction relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE